# SHACKAMAXON BANK v. BENJ. YARD ET AL.

## APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued January 23, 1891—Decided October 5, 1891.
[To be reported.]

(*a*) In 1873, the cashier of a state bank subject to the provisions of the act of April 16, 1850, P. L. 477, regulating banks, and to § 15, act of March 29, 1851, P. L. 295, requiring the cashiers of banks in Philadelphia to be elected annually by the directors thereof, gave to the bank an official bond reciting his election as cashier and conditioned as follows :

(*b*) That if the said cashier shall " for and during the time of his employment by the said bank, whether under his present election or under any subsequent election to the said position, or whether under its present organization or charter, or under any renewals or extension thereof, discharge and fulfil the trust thereby reposed in him," etc.

(*c*) Without formal re-election to his office at any time thereafter, the cashier was continued in his employment until 1885, when the bank became insolvent. The surety on the bond died in 1876; and more than one year after the bank had notice of the surety's death, the cashier began a course of fraudulent conduct in his official duties in breach of his said bond :

1. In such case, by the enlarging provisions of the condition of the bond, the obligors therein must be held to have undertaken to provide against the necessity for an annual renewal of the bond, and to extend the security afforded by it so as to cover the whole period of the principal's

Statement of Facts.

·service as cashier, though without a formal re-election from year to year.

2. The facts that the cashier's bond was not taken by the board of directors in the name of the commonwealth, and approved by the Court of Common Pleas and recorded, as required by § 10, article V., act of April 16, 1850, and that before the default of the principal, the bank had notice of the surety's death, will not relieve the surety's estate from liability: * per Hare, P. J.

Before Paxson, C. J., Sterrett, Green, Clark, Williams, McCollum and Mitchell, JJ.

No. 178 July Term 1890, Sup. Ct.; court below, No. 703 December Term 1885, C. P. No. 2.

To the number and term of the court below, above stated, the Shackamaxon Bank, to the use of Joseph Ferguson and W. E. Swire, assignees for creditors of said bank, brought debt against " Benjamin Yard and Mary E. Yard, his wife, executrix of Charles S. Murphy, deceased, " declaring on a bond of said Murphy as the surety of Thos. L. Huggard, the cashier of said bank, averring breaches.   The defendant executrix pleaded non est factum, nil debet, payment with leave, plene administravit.

At the trial, on January 14, 1890, it was made to appear that on February 17, 1873, Thomas L. Huggard was elected by the board of directors the cashier of the Shackamaxon Bank and Savings Fund (afterwards the Shackamaxon Bank), a state bank subject to the provisions of the act regulating banks of April 16, 1850, P. L. 477, and of § 15, act of March 29, 1851, P. L. 295, relating to the election of cashiers and solicitors of banks in Philadelphia county.†   On the same day William Bumm was elected by said board president of the bank.

---

* Only the recital and the condition of the bond, as stated in paragraphs (a), (b) of the syllabus, appeared·in the paper-books; but it was stated that the administrators, etc., of the obligors were bound in the usual form.   The points of paragraph 2 of the syllabus, especially the effect of the surety's death and the bank's knowledge thereof before the principal's default, were not squarely raised by the assignments of error, though more or less involved.   For this reason, the whole of the opinion of the court below, discussing these important subjects, is reported, post, 132.

† That the plaintiff bank was an incorporated association and subject to the acts referred to was not stated or shown distinctly in the paper-books, but was to be inferred from the arguments presented.

Statement of Facts.

That, on May 1, 1873, said Thomas L. Huggard and said Charles S. Murphy, defendant's decedent, executed a bond under seal to the said bank, in the sum of five thousand dollars, reciting and conditioned as follows:

" Whereas, the above-named Thomas L. Huggard has been duly elected cashier of the Shackamaxon Bank and Saving Fund:

" Now, the condition of this obligation is such that if the said Thomas L. Huggard shall, for and during the time of his employment by the said bank, whether under his present election or under any subsequent election to the said position, or whether under its present organization or charter, or under any renewals or extension thereof, discharge and fulfil with integrity and fidelity the trust thereby reposed in him, and faithfully and honestly execute the duties that may be assigned to him, then the above obligation to be void, or else to be and remain in full force and virtue."

That there was no record evidence that said Huggard was ever re-elected as cashier, although he continued to act as such until the insolvency and assignment of the bank in 1885. The president of the board of directors was re-elected annually.

That Charles S. Murphy died on June 8, 1876, and about ten days thereafter letters testamentary upon his estate were granted to Mrs. Mary E. Yard. Notice thereof being given to the bank, the account of the said Murphy was transferred to his said executrix.

That no default occurred on the part of Huggard, the cashier, until more than one year after the death of said Murphy, the surety, was known to the bank; but thereafter and until the bank's assignment extensive defaults were shown in breach of the said bond if still in force.

At the close of the testimony, the court, HARE, P. J., gave instructions to the jury and added:

I will reserve the third, fourth, and fifth points submitted by counsel for defendants, it being agreed by counsel for both parties that if I should have affirmed any or all these points, judgment for the defendants non obstante veredicto shall be entered by the court in banc. These points are as follows: *

---

* The paper-book of the appellant stated: " The material fact, though omitted to be stated explicitly, is distinctly admitted by implication, viz.,

Opinion of Court below.

3. The bond in suit not having been taken in the name of the commonwealth, as required by the act of April 16, 1850, the verdict must be for the defendants.

4. The bond in suit not having been approved by the court and recorded, as required by the act of April 16, 1850, the verdict must be for the defendants.

5. The act of March 29, 1851, requiring that the cashier shall be elected annually, and the default in this case having occurred more than a year after the death of the surety was known to the bank, the verdict must be for the defendants.

—The jury returned a verdict for the plaintiff for $5,000.

On April 25, 1890, a motion for judgment for the defendants, non obstante veredicto, on the points reserved, having been argued before the court in banc, an opinion was filed as follows, HARE, P. J.:

Thomas L. Huggard was elected cashier of the Shackamaxon Bank in the month of February, 1873, and soon afterwards united with the defendant's testator, Murphy, in giving a bond as security for the faithful performance of his office. The condition was that if the said "Thomas L. Huggard shall, for and during the time of his employment by the said bank, whether under his present election or under any subsequent election to the said position, or whether under its present organization or charter, or under any renewals or extension thereof, discharge and fulfil with integrity and fidelity the trust thereby reposed in him, and faithfully and honestly execute the duties that may be assigned him, then the above obligation to be void, or else to be and remain in full force and virtue."

The act of March 29, 1851, provides that the cashiers and solicitors of the several banks in the county of Philadelphia shall be elected annually by the directors in the same manner as the presidents thereof are now elected. This provision, which in requiring an annual re-election impliedly limits the cashier's term to one year, was disregarded, and Huggard suf-

---

that there was no formal election of Huggard by the board of directors, and his misconduct did not occur till after a year had expired after his election. So, as to the death of the surety before default. The court assumed these facts to be in the points, in their judgment, and in this court the same facts are to be assumed, as the parties consented to put the case on the points in the reservation."

Opinion of Court below.

fered to continue in office for more than twelve years without a re-election. During this long period, the president was guilty of many fraudulent acts in which the cashier participated, resulting in a loss to the bank of nearly $200,000. The surety, Murphy, died before these offences were committed, and the suit was brought against the executrix, Mrs. Yard. The directors were negligent in another particular; for, while the act of April 16, 1850, makes it their duty to require the cashier, tellers, and other officers of the bank, to enter into a bond to the commonwealth of Pennsylvania, the bond in suit was taken in the name of the bank, thus frustrating the object of the statute, which is to enable "any person aggrieved by the default of the obligors," to obtain redress without waiting for the assent of the president and directors.

The trial judge was requested, inter alia, to instruct the jury:

3. The bond in suit not having been taken in the name of the commonwealth, as required by the act of April 16, 1850, the verdict must be for the defendants.

4. The bond in suit not having been approved by the court and recorded, as required by the act of assembly of April 16, 1850, the verdict must be for the defendants.

5. The act of March 29, 1851, requiring that the cashier shall be elected annually, and the default in this case having occurred more than a year after the death of the surety was known to the bank, the verdict must be for the defendants.

These points were reserved under an agreement signed by counsel, that if the court in banc should be of opinion with the defendant on any or all of them, judgment should be entered in his favor. They may now be considered in the order in which they stand of record.

Justice would seem to demand that when security is given for the faithful performance of an office under a legislative enactment to that effect, the statute shall be construed in view of its object, which is to protect the citizen, and that the instrument shall not be held void simply because it is not worded as the act prescribes. Such a course of decision would sacrifice the letter to the spirit, and enable the parties to use their negligent or wilful failure to comply with the directions of the statute, as a means of evading the obligation which the legisla-

ture intended to impose.   It has, notwithstanding, been held
that bonds given for the performance of a public office in pur-
suance of a legislative fiat, must not impose an obligation dif-
fering in kind, or that will inflict a greater burden, and if this
principle be disregarded the instrument will be invalid.   It is
not an answer that the obligor saw fit to incur a different liabil-
ity and must abide by his choice.   For, as he cannot enjoy his
office without giving security, he is not entirely a free agent
and should not be required to do more or other than the act
enjoins.   The object nevertheless, is to protect the obligor, and
the rule does not apply unless he is prejudiced.   As Chief
Justice GIBSON observed in Commonwealth v. Laub, 1 W. &
S. 261, 263, " A variance between a statutory bond and the re-
quisitions of the law is fatal to it, only when the condition
would impose a greater burden than the law allows.   An alter-
ation lessening the liability is not a defence."   So considered,
there is no valid objection to the instrument in suit.   The con-
dition is substantially what the law requires; and if the fail-
ure to take the bond in the name of the commonwealth might
prejudice the creditors of the bank, or be a ground of recovery
against the directors, it does not alter the position of the prin-
cipal or surety for the worse : Shunk v. Miller, 5 Pa. 250 ; Mc-
Caraher v. Commonwealth, 5 W. & S. 21 ; Power v. Graydon,
53 Pa. 198.

The point is not less clearly with the plaintiff in another as-
pect.   It may be that where a public office is held under the
statutory or common law, and there would be no power to ex-
act a bond did not the legislature so provide, the act must be
followed, or at least not so departed from as to injure the obli-
gors, although the case of Commonwealth v. Wolbert, 6 Binn.
292, looks the other way; but if such is the rule it does not
apply to an appointment made by a private corporation, which
would be entitled to demand security from its officers at com-
mon law.   Under these circumstances, the statute simply regu-
lates an existing power; and while a failure to comply with its
requirements may render the parties in default answerable, it
will not discharge the officer or his sureties, unless the object
is not only to indicate a particular form, but to prohibit every
other : United States v. Bradley, 10 Pet. 343, 364 ; United
States v. Linn, 15 Idem 290, 317.   No one denies that the di-

Opinion of Court below.

rectors might have taken the bond in suit, although the act of March 29, 1851, had not been passed; and it should not be so construed as to discharge the persons whom the legislature intended to bind, and prejudice the persons whom they sought to protect. It cannot be said that the cashier, or the surety who came forward in his behalf, was under any compulsion that could render the bond involuntary, because his right depended on the votes of the directors who might impose any conditions calculated to protect the bank: Bank of Northern Lib. v. Cresson, 12 S. & R. 314; Greenfield v. Yeates, 2 R. 158.

It is not easy to find a solid ground for the support of the defendant's second contention, that the surety's death invalidated the bond as soon as it became known to the directors. His intention to contract an enduring obligation is as plain as that he took the appropriate means to make it effectual. The instrument is the most formal known to the law. The obligors not only bound themselves, but their executors and administrators; and these terms signify, when turned into ordinary speech, that the surety would not only be answerable while he lived, but that his estate should make good defaults occurring after his death. What Murphy intended is therefore plain, and it cannot be said that power was wanting. It is not denied that a man may, by an instrument executed in his lifetime, provide for the disposition of his property after he has gone. He may devise the whole or any part of it to a charitable use, or bestow it on an entire stranger, to the exclusion of his children or next of kin. It would be strange if a gift were more binding than a contract. The right to bind a man's personal estate by a bond is accordingly as old as his right to bequeath by a will, and, under our laws, real property is on the same footing as personal. There is certainly nothing in the object for which the bond in suit was given, to take it out of the rule. The demand for security was not only a common-law right, but a duty enjoined by statute, and the surety's death is not a justification for the refusal of the executrix to fulfil the contract as far as the funds in her hands will go.

Yet the defendant contends that the board should, on learning of Murphy's death, have required Huggard to give another bond, with a sufficient surety, and on his failure to comply, have dismissed him and appointed some one who was willing

and able to fulfil the condition so imposed. Until this, which might take weeks or months, was accomplished, the bank would remain unsecured, and the creditors would have no redress in the event of the cashier's failure. Such an interpretation is at variance with the requirements of trade and the language of the act of assembly. Business would be insecure if the contracts of solvent debtors could not be enforced against their estates, and the legislature obviously intended that the depositors and stockholders should be safe. It is not just that the death of a person who has guaranteed the good behavior of a confidential agent should leave the employer unsecured, nor that the employer should be obliged to dismiss the agent, and look for some one else to fill his place, at the risk of the delay and inconvenience which may result from such a change. While a guaranty will not be carried beyond its terms, it should still be read in the sense in which the words would naturally be understood by the person to whom they are addressed, and no condition introduced which is not set forth in terms or plainly implied: Douglass v. Reynolds, 7 Pet. 113; Lawrence v. McCalmont, 2 How. 426, 450; Gates v. McKee, 3 Kern. 232 [64 Am. Dec. 545].

The authorities cited during the argument show that a promise to be answerable for another's default will not fail on the death of the promisor, unless it is so far incomplete that it might have been retracted in his lifetime. But it is also true that to render a parol guaranty of a contract between third persons irrevocable, some promise must have been made or act done on either side that will make the contract obligatory on both, for if the parties are not held together the guarantor will be equally at large.

A promise that such loans as A may think fit to make B during the ensuing year, or any other definite period, shall be repaid, may consequently be retracted before the money is advanced, or after the advances which have been made are refunded, although the year has not expired; and where the testator is entitled to give such a notice, it will not be less valid because coming from his executors: Offord v. Davies, 12 C. B., N. S., 748. The revocation must, notwithstanding, be communicated to the person who is to make the advance, and if he is left in ignorance it is immaterial that the guarantor

Opinion of Court below.

has changed his mind, or even that he mailed a letter which did not reach the lender until he had parted with the money. It has, notwithstanding, been contended, that when nothing has been done and no engagement entered into on the faith of the guaranty, it will fail immediately on the death of the guarantor, even if this is unknown to the person whom the instrument purports to secure, and he discounts bills or sells and delivers goods in the belief that the guaranty is still in force. In Jordan v. Roberts, 122 Mass. 171, the court decided that a covenant to be answerable for such goods as a third person may buy, does not render the guarantor's estate answerable for purchases made after his death, because, until the goods are sold there is no consideration, and, as the contract is not mutual during the guarantor's life, it cannot be rendered obligatory by anything that is done subsequently. An opposite conclusion was reached in Bradbury v. Morgan, 1 H. & C. 249, on the ground that a person who acts in reliance on a promise, without knowing that the person who gave it is deceased, should be compensated for any resulting loss. The American cases which decide that the principal's death does not invalidate the contracts of the agent, unless it is known to the persons with whom the latter deals, may stand on this ground against the technical view of the English courts, and cannot well be referred to any other. See Cassiday v. McKenzie, 4 W. & S. 282; Ish v. Crane, 8 Ohio 522; Smart v. Sanders, 5 C. B. 895; Campanari v. Woodburn, 15 C. B. 400.

Whatever may be thought of the doctrine of Jordan v. Roberts, as contrasted with that held in Bradbury v. Morgan, it does not apply to guaranties of contracts that have become mutual through performance, nor where, as in the present instance, all that the guarantor stipulates for is performed in his lifetime. In Offord v. Davies the goods were sold after the guarantor's death, and there is no decision that where an agent is employed during the life of the person who has guaranteed his fidelity, the guarantor's undertaking will fail or become revocable when he dies. In Calvert v. Gordon, 7 B. & C. 809, 2 Sim. 253, 4 Russ. 581, the bond was conditioned for the fidelity of a collecting clerk. The obligor died, and his executrix gave notice that she would no longer be responsible for the clerk's good conduct, and that if the plaintiffs continued to

Opinion of Court below.

employ him it would be at their own risk.   He remained in ·
their service, and it was not only held that they could recover
at law for a subsequent failure on his part to account, but a
bill in equity filed by the executrix was dismissed by the lower
court, and on appeal.   The judgment in Loyd v. Harper, 16
Ch. Div. 209, 313, is to the same effect.   These cases seem to
be conclusive; and, so far as I am aware, there is no decision
that a man who employs an agent on the faith of an under-
taking by a third person, will lose the benefit of the guaranty
on the surety's death.

The case of Harris v. Fawcett, 8 Ch. App. 866, cited by the
defendants, does not seem to be in point.   The guaranty in
suit was so worded as to be revocable on six months' notice,
and as it had been given for the executor's benefit, and he was
equitably bound to exercise the power of revocation, the court
held that what ought to have been done should be considered
as done, and as the creditors were cognizant of the equity they
could not recover.

The point would also seem to be with the plaintiff, on the
ground that a bond is not less irrevocable because it is given
as an inducement to an act which is not performed until a
future day.   It was, indeed, decided in Jordan v. Roberts,
above cited, that an undertaking under seal to be answerable
for such sales as the plaintiffs might make to a third person
before the guarantor gave notice to the contrary, became in-
operative at his death.   The court said that death terminates
the power of the deceased to act, and revokes any authority
or license which has not been executed or acted upon.   His
estate may be held under any contract upon which a liability
existed during his life, although depending upon future con·
tingencies; but it cannot be held for a liability arising after
his death through the exercise of a power or an authority
which he might have revoked.   The provision that the guar-
anty should continue until written notice was given by the
guarantor, might affect the mode in which he could exercise
the right to revoke the guaranty, but did not render the in-
strument less revocable by his death, and the nature and con-
struction of the writing were not changed by the fact that it
was under seal.   In the opinion of the court, a covenant that
if the covenantee will do a certain thing within a given time

he shall be remunerated, is not binding unless performance occurs during the covenantor's life, although the covenantee complies before the time expires, in ignorance of the covenantor's death.

This conclusion would seem to be at variance both with the civil and common law. It implies that a contract, however formally made, cannot be rendered obligatory by the agreement of one party to give and of the other to receive. A parol promise is not binding unless the promisor stipulates for an equivalent, or in other words, for a consideration; and it may be that the condition must be fulfilled during his life in order to bind his executor. But it is equally well settled that contracts in writing and under seal become obligatory immediately on execution and delivery, by affording conclusive proof that the minds of both parties met in a common purpose which one of them agreed to fulfil: Rann v. Hughes, 7 Term R. 350; Schoonmaker v. Roosa, 17 Johns. 301, 303; Candor's App., 27 Pa. 119, 121; Dorr v. Munsell, 2 Mass. 259; Page v. Trufant, 65 N. C. 454; United States v. Linn, 15 Pet. 290, 317. The want of a consideration is not, therefore, an objection to a bond or covenant, although the failure of the cause or consideration may operate as an equitable defence: Fallowes v. Taylor, 7 Term R. 471; Yard v. Patton, 13 Pa. 278, 285; Bunn v. Winthrop, 1 Johns. Ch. 329, 337. As LEWIS, C. J., observed in Candor's App., "In this respect a simple contract differs from a specialty. In the one case, the party is not bound without a consideration. In the other, no consideration is necessary if none was contracted for." If the authorities are not more numerous, it is because until recently the rule was regarded as indisputable. It has sometimes been contended that a man should not be allowed to break a written promise simply because the opposite party has not done or promised anything in return, but never, so far as I am aware, that a consideration is necessary to the obligation of an undertaking under seal. See Pillans v. Van Mierop, 3 Burr. 1663; Rann v. Hughes, 7 Term R. 346. Had the guaranty in Jordan v. Roberts been for a valuable consideration moving from the party to whom or for whose benefit it was given, it would confessedly have bound the guarantor in his lifetime, and consequently his executors. As has often been said, a "seal imports a consideration:"

United States v. Linn, 15 Pet. 290, 317; or, more accurately, a consideration became, in the course of centuries, after much debate, equivalent in many respects to a seal. We may therefore infer that a covenant to be answerable for such goods as the covenantee may sell to a third person, before he is notified to desist, does not resemble a naked power, and is, on the contrary, as irrevocable as a bond or covenant for the payment of money on the happening of any other future or contingent event. The contingency does not touch the existence of the obligation, and is simply, will the thing for which the obligor stipulated be fulfilled? Here the common law, except in requiring a seal, follows the civil law, in holding that a promise to be answerable if the promisee will do a certain act, is irrevocable as soon as he signifies his assent, although subject to a condition which suspends the obligation until the act is done: Maynz, vol. 1, § 6, p. 469; vol. 2, § 205, p. 178; Pothier, Traite des Obligations, Part. 11, Ch. III, article 1, §§ 1, 3.

The remaining question affords ample room for argument. It is conceded that the obligation would not have endured beyond the current year without a stipulation to that effect; but the plaintiff contends that, inasmuch as the bond is conditioned for the cashier's "good behavior for and during the term of his employment by the said bank, whether under his present election or any subsequent election to the said position," effect should be given to the plainly expressed intent that the surety's liability should endure so long as the principal remained in the service of the bank. There was no second election, but the cashier must be presumed to have held over with the assent of the directors, and it was immaterial that their approval was tacit without a formal vote.

The argument has much weight, but does not cover the entire ground. In many respects it matters not whether the cashier is re-elected or suffered to remain in office. His responsibility to the bank is the same, and it is equally bound by his acts. It does not, however, follow that his fitness will be as carefully considered at the close of each succeeding year, where he holds over by sufferance, as if the question were brought before the board. The point would appear to me doubtful, were it not for the language of the act of assembly. The legislature there provided for an annual election, and,

Arguments.

even if the clause is merely directory, the surety was entitled to suppose that it would be obeyed. The phrase " under the present election, or under any subsequent election," should consequently be taken as restricting, rather than enlarging the preceding clause, " as long as he shall remain in the service of said bank." If this stood alone there could be no doubt of the surety's liability; but the qualifying words should not be stretched beyond their literal meaning, or read as implying a holding over without a deliberate vote. Here the distinction between the principal and the surety is marked, because the former is precluded from raising an objection which he waived at the time, while the latter derives no benefit from the consideration, and may insist on the letter of the bond.

Judgment is entered for the defendants on the third point above enumerated.

—Thereupon, the plaintiff took this appeal, specifying that the court erred in entering judgment for the defendants, and in not entering judgment for the plaintiff, on the points reserved.

*Mr. R. C. McMurtrie,* for the appellant :

1. If we start with the admitted fact that the cashier was for all purposes of official position elected, i. e., chosen, to the office by the proper authorities by silent acquiescence, or, by implication, we are in a proper position for determining the question in issue, which is the purpose, effect, and meaning of the words of the contract. The court read them as if they were inserted as a condition precedent to liability. They are so, but not in the sense attributed to them. They are so, because if not elected liability is impossible. But, to suppose that the surety stipulated for the election in that sense is, of course, absurd. For, unless Huggard did act as cashier, how was it possible there could be any action for which the surety could be liable? The surety, therefore, did not mean to stipulate for the existence of a relation between Huggard and the bank that would or might give rise to a liability on his part. The clause was introduced for quite another purpose. Its object was quite the reverse of the one supposed or assumed. It is the language of the other party, or rather a clause introduced for the benefit of the other party. It was intended solely to obviate the ne-

cessity of renewing the obligation annually; to define the period of the obligation by the period of employment, and to exclude the inference of a limitation to the particular term for which the appointment was made when the suretyship was created.

2. All the words of the bond relied upon to limit the period or term, I submit, were intended to enlarge and extend the term. The contract begins by stipulating for liability " during the time of his employment." It is not limited even as to the mode of employment; and it relates by implication only to the employment as cashier; but this is as distinctly shown as if expressed. The words added do not contain anything indicative that the addition is a condition on which the liability is to take effect. Would any board, at an annual meeting, silently or by an unrecorded vote appoint the same officers for the next year that they would decline to elect viva voce or by ballot, or to enter their choice on the minutes ? Looking at the second branch of the addition, " whether under its present organization or charter, or under any renewals or extension thereof," is it reasonable to say that the parties had in their minds a clause in the banking act in reference to the election of the cashier, and that they intended that a compliance with this clause should make their contract conditional upon compliance with it ? Is it not exactly the reverse, and is not the intention clear that it was intended to eliminate the otherwise implied term of the contract that the liability was limited to the employment then contracted for, and to show that any future employment as cashier was intended to be covered ? It being admitted the guaranty is a continuing one and that it extends to all future employment of Huggard as cashier, there is, I submit, nothing that warrants the inference that it was conditional on the mode of selecting him.

3. This is not the case of an election of a public officer, nor even one in which there is a direction in the statute as to the mode of electing. The test is, could the bank after accepting the services have declined paying the salary ? If Huggard could have sued for his salary and proved his election by acts and deeds and the acquiescence of the directors, the rule relied on cannot prevail here. That rule always applies to the parties. It is precisely here that the distinction between de facto and

de jure lies.   Will it be asserted that a servant whose services have been accepted by the electoral body can be disclaimed by themselves after acquiescing in his exercise of the functions? We are dealing with a private corporation, a mere chartered partnership; not with a public functionary or office.   There is nothing in the statute that really touches the question.   It provides that the cashier shall be elected annually, but as to the mode of electing it is silent.   It refers to the mode of electing the president, and is silent as to the manner of doing that. A private corporation, by continuing to employ, elects precisely as it does by voting.   It is like all other contracts; continuance to deal after expiration of a term is an implied renewal, appointment, or choice.

4. The important question is, How is this paper to be construed as against the surety?   I insist that there is no distinction in this respect between a surety and a principal, so far as the construction or meaning or effect of a document is concerned.   There is a broad distinction between the liability of the principal and of the surety.   But not under the written contract.   That may be varied by the principal, but it is not the contract that is varied; it is another contract that arises by implication which varies the liability.   Naturally, the plea of non in hæc fœdera veni is never used by the principal, because he is sued, not on the express contract, but on that growing out of his conduct.   I think it is sometimes overlooked that the apparent strain not to hold a surety is nothing but a strict exaction of the very contract, and this only because there is no other ground of liability.   This is distinctly and well put by Smith, J., in Yard v. Lea, 3 Y. 344 (4 Dall * 97 n.); Roth v. Miller, 15 S. & R. 107; Cooke v. Graham, 3 Cranch 235; Miller v. Stewart, 9 Wheat. 703.   I therefore submit: 1. The contract was misconstrued.   It was the intention of the surety to be liable for the acts of Huggard so long as he continued to be de facto the cashier of the bank with the consent of the directors.   2. The act of 1851 does not require any particular mode of election of a cashier, and the acceptance of his services as cashier by the directors was an election within the meaning of the act.   The word election as there used means no more than choose or appoint in the act of 1850.

5. There remains the other question which, though decided

Arguments.

by the court below in favor of the plaintiff, is still open on the point reserved; for, if the court were wrong on either point the judgment below was right. This point is: Does the death of the surety discharge him from further liability? It is not disputed by me that if the surety could at his option terminate the liability, it is terminated by his death and notice to the bank of that fact. The authority is, I think, conclusive: Harris v. Fawcett, 8 Ch. App., 866; as is also the reason there given, which is that the capacity to give notice of termination being gone, the executors could not, if they desired, keep it alive. But a contract, not by its terms determinable at the option of the surety, is not terminated by death, either at law or in equity: Calvert v. Gordon, 7 B. & C. 809, 812, decides this at law. Gordon v. Calvert, 2 Sim. 243, affirmed on appeal, 4 Russ. 581, decides it in equity.

*Mr. Alexander Simpson, Jr.*, (with him *Mr. A. W. Horton*), for the appellees:

1. Is the surety liable, whether or not there was a re-election of the cashier? The stress of the argument seems to be that the words in the bond, " for and during the time of his employment by the said bank," import an indefinite liability, notwithstanding the recital in the bond of his election to an office which by statute is made an annual one, and that the added words, " whether under his present election or any subsequent election," enlarge rather than limit the liability. The learned judge below construed these words as restricting rather than enlarging. But the same result is reached if the words be considered as enlarging. The fallacy is in assuming an indefinite liability under the preceding words. It has often been decided that under such circumstances, in the absence of enlarging words, the liability is restricted to the then current term: Kitson v. Julian, 4 E. & B. 854 (82 E. C. L. R. 853); Bamford v. Iles, 3 Exch. 380; Manuf. & M. S. & L. Co. v. O. F. Hall Ass'n, 48 Pa. 446; DeColyar on Guaranties, *226; Peppin v. Cooper, 2 B. & Ald. 431. It follows, that plaintiff's first position is wrong, and but for the added words, " whether under his present or under any subsequent election," clearly the surety would not be liable. Moreover, the argument substantially treats these words as mere surplusage, a construction never to be accepted unless wholly unavoidable.

Arguments.

2. Was acquiescence by the directors in the cashier's continuing to act, equivalent to an election within the words of the bond and the acts of assembly? The enactments bearing on the point are § 10, articles I., II., V., act of April 16, 1850, P. L. 480, 481, and § 15, act of March 29, 1851, P. L. 295. The fair conclusion from a review of these provisions would be that the election of the cashier may be viva voce, or by ballot, or by any other known way of deliberately expressing the will of the voters; but it cannot be that a total failure to act would be equivalent to acting because the method of acting is not expressed. The act, in this respect, places the president and the cashier on the same plane; yet the president's term of necessity expires with the year, for he must be a member of the board, and he ceases to be such with the expiration of his year. It is submitted that this is not merely a question of construing the contract. It is as much or more a question whether a condition precedent to liability has been performed. True, questions of construction are the same for principal and surety; but questions of performance are not, and in the case of a surety the performance must be literal: Whitcher v. Hall, 5 B. & C. 269 (11 E. C. L. R. 458); Hibbs v. Rue, 4 Pa. 352; Clippinger v. Creps, 2 W. 48; Boschert v. Brown, 72 Pa. 375.

3. Does the fact that the office is an annual one, and that the default occurred more than a year after the death of the surety was known to the bank, relieve the estate of the surety? It is admitted that if the surety could at his option terminate the liability, it is terminated by his death and notice of that fact, counsel citing: Harris v. Fawcett, 8 Ch. App. 866. The authorities are numerous on the point, among them, Slagle v. Amberson, 1 Mona. 30. It would seem to be equally clear that the same result is reached where the contract is severable, though it is not by its terms determinable at the option of the surety: Coultharp v. Clementson, L. R. 5 Q. B. Div. 42; Slagle v. Amberson, 1 Mona. 30; a limitation to that effect being read into the contract. So, no matter how broad the language of the suretyship, if the time during which the relation between the principal debtor and creditor is to subsist, is divided into terms, the surety may by notice relieve himself from liability for all future terms: Pleasonton's App., 75 Pa. 344. The office in this case being an annual one, and, it being con-

ceded that the death of the surety and notice thereof is equivalent to actual notice by the surety to terminate, the rule of Pleasonton's Appeal would appear to be decisive of this case.

OPINION, MR. JUSTICE WILLIAMS:

This action was brought upon a cashier's bond. The defence made by the surety rests on his construction of the condition in the bond. It appears that one Thomas L. Huggard was elected cashier of the Shackamaxon Bank in 1873, and gave a bond to secure the faithful discharge of his duties, with Murphy as surety. It is clear that all the parties contemplated the establishment of permanent relations between the bank and its cashier. They knew that the office was an annual one, and that a bond in the ordinary form would impose no liability beyond the current year. They undertook, therefore, to provide against the necessity for an annual renewal of the bond, and to extend the security afforded by it so as to cover the whole period of Huggard's service as cashier, by giving to the condition the following form: " If the said Thomas L. Huggard shall for and during the time of his employment by said bank, whether under his present election or under any subsequent election to the said position, or whether under its present organization or charter or under any renewals or extensions thereof, discharge and fulfil with integrity and fidelity the trust," etc.

The bank relied on the bond in this form and did not require its renewal, and Huggard remained in the employment of the bank, as its cashier, down to the time of its disastrous failure in 1885. A course of fraudulent conduct was entered upon by him, as we understand the evidence of Mr. Faunce the expert accountant, in 1877 or 1878, which continued until, and which grealty contributed to, if it did not occasion, the final collapse. Sometime after the bank was closed, this action was brought upon the cashier's bond and the surety asks to be relieved from his undertaking because the evidence does not show a formal re-election of his principal year by year to the office of cashier. The learned judge of the court below thought the position well taken, holding that " the phrase under the present election or under any subsequent election" should be understood as restricting, rather than enlarging the preceding clause " during

Opinion of the Court.

the time of his employment by the said bank;" and that, to render the surety liable, a formal re-election annually must be shown by the plaintiff. Our inquiry, then, in the first place, is whether the words referred to are restrictive or enlarging in their operation, and next, whether a formal re-election is necessary in order to continue the liability of the surety.

The condition was intelligently framed. The scrivener seems to have been aware of the general doctrine affecting the liability of sureties on official bonds, as laid down in Addison on Cont., 1117, and as applied in the Manuf. & M. S. & L. Co. v. O. F. Hall Ass'n, 48 Pa. 446. Instead, therefore, of making the bond relate to the term to which Huggard was elected, he used the words "during the time of his employment by the said bank" as cashier. Then, as if apprehensive that these words might also be restricted to the term to which Huggard had been elected, he added the further words, for the express purpose of enlarging the scope of those previously employed, "whether (such employment shall be) under his present election or under any subsequent election to the said position." The fear seems then to have suggested itself that even these words were not broad enough, because they might be held to be limited to the present charter. He then adds, to relieve against this danger, the further words, "or whether under its present organization or charter, or any renewals or extensions thereof." The object of these explanatory sentences was to relieve against the fear that the previous words might be held to relate to the present term of Huggard, or to the present form of organization under the existing charter of the bank, and by express words to so enlarge the condition as to exclude such interpretation of it. In this form it was intended to protect the bank during the time of Huggard's employment as cashier, and during the existence of the bank, though acting under a renewal or extension of its charter at the time a breach should occur. In this form it was executed by both principal and surety and accepted by the bank. The purpose to make the bond impose a continuing liability and relieve against the necessity for annual renewals was a lawful one, and the words employed for that purpose are apt and sufficient.

The question is not new or barren of authority. In Mayor of Berwick v. Oswald, 3 E. & B. 653, a person was elected bor-

ough treasurer, which was then an annual office. He gave bond for the faithful performance of his duties as treasurer "during the whole time of his continuing in said office, in consequence of the said election or under any annual or other future election to the said office." The bond was given in 1842. He held the office until 1848. The term had been changed meantime so that it became an office to be held during the pleasure of the borough councils, instead of an annual one. The default occurred after the change of the term and the appointment of the treasurer for an indefinite term. The surety pleaded these facts as a defence, but the court regarded them as insufficient, and held that the surety was liable for the default occurring after the change in term of office and while the treasurer was holding under an appointment made after such change had taken place. The same question was raised in Mayor of Dartmouth v. Silly, 7 E. & B. 97, and the same rule was held. It may be regarded as settled that the obligation of a bond for the faithful discharge of the duties of an office or an employment is co-extensive with the duration of the office or employment. If the office is for life the liability of the surety will continue during the life of the incumbent. If the term is indefinite, as during good behavior or at the pleasure of the employer, the liability of the surety is indefinite and will continue until the will of the employer is exercised and the term ended: Addison on Cont., § 1118. Substantially the same rule was applied in Coe v. Vogdes, 71 Pa. 383. The action in that case was against the surety of a tenant who had held over and was in arrears for rent. The lease was for one year, but contained a stipulation that if the tenant should remain in possession after the end of the term, the lease should "continue for another year, and so on from year to year until legal notice is given for a removal." The sureties signed a stipulation agreeing to be liable for the performance of the lease on part of the tenant. The rent for the first year was paid, but the tenant held over and the sureties were notified. They thereupon gave notice that they would not be further liable, and the tenant paid to the end of the then current year. The action was for rent accruing during a subsequent year. The sureties replied, first, that they were only liable for the original term of one year; and next, that after the year expired they had given no-

Opinion of the Court.

tice of their refusal to be bound. They were held liable for the tenant's performance, not only during the first year, but during the holding over ; and this court said that "a mere notice by a surety that he would not be liable was no defence ; he could not dissolve the contract at pleasure."

The remaining question is, was Huggard still in the employment of the bank as cashier when the default sued for occurred ? It is conceded that he was acting as cashier at the time, and that it was because of that fact that it was possible for him to inflict the injury complained of. It is conceded, also, that the bank recognized and accepted him as its cashier, trusted him with the custody of its funds, paid him his salary, and held him out to the world as such. He could not deny his official relation to the bank, nor could the bank disavow or repudiate his acts done in their service within the scope of a cashier's authority. As Huggard and the bank employing him are concluded by their conduct, both as to the public and each other, the surety, standing on the same ground with his principal so far as the writing is concerned, is also concluded. The employment of the principal as cashier with the position and emoluments legitimately belonging to the office was the object of the bond. This object was secured and the principal was for twelve years in possession of it. If the action of the directors was irregular, the irregularity was never taken advantage of. If his title to the office lacked authentication by the record of a formal election, nobody ever questioned his right or suggested a doubt about his powers. If either he or the bank could have set up want of an annual re-election as an excuse for terminating the relation between them, neither did so, but both waived the want of form and continued the official relation. No form of election is provided for by the statute, and none is made necessary by the bond. So far as the liability of the principal or surety on this bond is concerned, continuous service, beginning in a formal election and extended by mutual consent with the acquiescence of all parties interested, is enough.

> The judgment of the court below is now reversed, and judgment is now entered on the points reserved in favor of the plaintiff.