Henry Fink *v.* Farmers' Bank of Harrisburg and Peter K. Boyd, Thomas L. Wallace, George F. Rohrer, Chas. H. Bergner, John Motter, Martin Good, S. B. Huff, David Dietz and F. C. Fink, Directors, and Edward Bailey, Agent of Said Bank, Appellants.

*Equity—Mutual mistake of legal rights.*

Equity will not afford relief in cases of mutual mistake of legal rights where it is impossible to restore both parties to the status quo.

*Principal and surety—Bond of cashier—Mutual mistake—Equity.*

The surety on the bond of a bank cashier who with knowledge of the facts but in mistake of the legal effect of them, has given his notes in settlement of a defalcation of the cashier, cannot maintain a bill in equity to compel the redelivery to him of the notes unless he can prove that the parties have remained in the status quo.

*Principal and surety—Bond of bank cashier—Continuing employment.*

The contract of suretyship though only enforced according to its strict terms is nevertheless nothing more than a contract. No particular form of words is necessary to be observed, and in construing it courts should be governed by the rule applicable to all other contracts that the actual intention of the parties must prevail. As to official bonds the presumption that they apply only to the existing term of the officer may be admitted, but the presumption is very far from conclusive, and if it is clear that the parties meant to create a continuing liability, the bond must be held to have done so.

*Promissory notes—Consideration—Settlement of disputed claim.*

Promissory notes given by the surety on the bond of a bank cashier in settlement of a defalcation are supported by sufficient consideration where it appears that the bank forbore to sue on the bond; or that the notes were given as the result of negotiation and compromise; or that they were credited on the cashier's account; or that in reliance on the settlement there was a change in the position of the parties so as to make a restoration of statu quo impossible; or that the bond was surrendered to the surety; or that the credit of the bank was maintained by the settlement; or that owing to the settlement permission was given by the superintendent of banking to continue business.

Argued June 1, 1896. Appeal, No. 14, May T., 1896, by defendants, from decree of C. P. Dauphin Co., Equity Docket, No. 172, on bill in equity. Before Sterrett, C. J., Green, Williams, McCollum, Mitchell, Dean and Fell, JJ. Reversed.

Bill in equity for an injunction and to compel the delivery of certain promissory notes.

The case was referred to M. W. Jacobs as master, who reported the following facts :

1. The Farmers' Bank of Harrisburg was incorporated by a special act of assembly, approved March 27, 1873, for the purpose of carrying on the business of banking in the city of Harrisburg.

2. Immediately after its incorporation the said bank commenced business under its charter and so continued until February 20, 1893, when it was closed by its directors at the direction of the superintendent of banking, since which time its affairs have been in liquidation.

3. The charter contains the following provisions: "Sec. 5. That the affairs of said bank shall be conducted by a board of directors to be chosen as hereinafter directed and provided; that the said board of directors or a majority of them shall elect a president and a cashier from their own number and such other officers as they may deem necessary, and fix the compensation of the same; and all officers shall give bonds with good securities, in such sums as may be required by said board, for the performance of their several duties. Sec. 6. That the said bank shall keep its office in some suitable place in the city of Harrisburg; and on the first Monday of May one thousand eight hundred and seventy-three and on the first Monday of May annually thereafter, after two weeks' previous notice, the stockholders shall convene at the office of the bank and by ballot elect not exceeding twelve stockholders as directors (the number to be fixed by the by-laws), who shall continue in office one year or until their successors are elected; and the directors so elected shall annually elect one of their number president and one as cashier."

4. Frederick C. Fink was elected cashier of the bank in May, 1873, and immediately entered upon the discharge of the duties of his office, and, in pursuance of the above provision of section 5 of the act of incorporation, executed and delivered to the bank a bond, dated July 21, 1873, in the sum of $20,000, with his brother, Henry Fink, the plaintiff, as surety, the condition of the bond being as follows :

·  "The condition of the above obligation is such, that whereas the above bounden Frederick C. Fink has been appointed cashier in the said Farmers' Bank, of Harrisburg, Pa.: Now therefore the condition of the above obligation is such that if the bounden Frederick C. Fink shall well, truly and faithfully perform all· the duties assigned to and trust reposed in him as cashier of the said Farmers' Bank, of Harrisburg, Pa., so long as he shall continue in that capacity, then the above obligation to be void, otherwise to be and remain in full force, virtue and effect."

This bond was the only one ever given by said F. C. Fink to the bank to insure the faithful performance of his trust.

5. F. C. Fink was re-elected in May, 1874, and continued by annual elections held in May of each year thereafter in the office of cashier of said bank down to the time it was closed, when it was discovered that he had misappropriated the funds of the bank to a large amount, which was subsequently ascertained to be about $27,000.

6. This amount of money had been abstracted from the funds of the bank from time to time by the cashier without the assent of the directors or other officers, or any of them, and its absence had been concealed by substituting for it his own due bills, memoranda and demand notes, which were placed by him among the cash items in the drawer and accounted for as such cash items in the weekly statements made by him to the directors. When the first of these defalcations, or "shortages," as they are frequently called in the testimony, occurred, does not appear, but probably not before 1880 and certainly not earlier than 1875 or 1876; nor does the amount of the first defalcation appear, but the master finds that it did not exceed $5,000.

7. The directors met weekly, received the reports of the cashier, passed upon discounts, examined the expense account, passed to the surplus such funds as they deemed proper, and at stated periods declared dividends, but beyond that, at least since 1887, they appear to have exercised little or no oversight of the management of the bank. The cashier was a trusted official, enjoying the entire confidence of the directors, and into his hands was committed, beyond the matters already mentioned, almost the entire management of the bank, his reports, whether intended for their guidance and information or for publication under the banking laws, being accepted by them without question as correct.

8. In April, 1874, nine months after the bond referred to in paragraph 4 was given, the board of directors adopted by-laws, among which was the following:

" There shall be a committee to be known as the executive committee, to be composed of the president and two directors appointed by the board annually, whose duty it shall be to examine into the affairs of the bank every three months and at such other times as they may deem expedient, and report to the board at the first meeting after such examination."

9. An executive committee was accordingly appointed, which continued from time to time to make quarterly reports that " they had carefully examined into the affairs of the bank and had found everything in accordance with the cashier's statement," or " that they had carefully examined the assets of the bank and found them as stated in the cashier's statement." These examinations were made with apparent regularity down to the beginning of the year 1877, when they ceased and were never again resumed, and the master finds that the defalcations of the cashier began after these examinations ceased to be made.

10. Apart from the by-laws above referred to, the master finds from the evidence before him that it is the custom of well conducted banks to verify periodically the statements of their cashiers by actual physical examination of the assets of the bank; that had such examinations been made by the directors of the Farmers' Bank, the abstraction of cash from the funds of the bank by the cashier and the substitution therefor of his due bills, memoranda and demand notes, if done at all, would have been discovered; that said directors were negligent in failing to perform this duty, and that by their failure so to do the defalcations of the cashier in the manner in which they were made and the extent to which they grew were rendered possible. The master finds, however, in this connection, that the allegations contained in paragraphs 10 and 11 of the original bill are not supported by the evidence, and there is no evidence tending to show that any one connected with the administration of the affairs of the bank was directly or indirectly connected with, connived at, or prior to February of 1893 knew of the defalcations of the cashier, either in whole or in part.

11. On February 17, 1893, the superintendent of banking, suspecting that the condition of the Farmers' Bank was not

what the published reports of its cashier and directors showed it to be and for other reasons which do not clearly appear by the testimony, caused an examination into its affairs to be instituted, with the result that he on that day discovered the cashier to be a defaulter to an amount exceeding $25,000.   Later in the afternoon of the same day he called together some of the directors at the banking house and informed them of his discovery.   The cashier being called before them admitted the defalcation and the approximate accuracy of the amount alleged, produced the bond referred to above in paragraph 4, and stated that the plaintiff, who was surety on the bond, would stand good for $20,000, the amount of his bond.   He was thereupon directed to communicate with the plaintiff and report the result of his interview at a meeting of the directors to be held later in the evening. He accordingly called upon the plaintiff, laid before him his trouble and reminded him that he, the plaintiff, was on his bond, and at the subsequent meeting of the directors reported that he had seen the plaintiff and suggested that some of the directors should call upon him.   In pursuance of this suggestion one of the directors, who was also their legal adviser, called upon the plaintiff at his place of business early the next morning. The interview was a brief one and went little beyond fixing a time for the plaintiff to meet the directors at the banking house. It is to be noted, however, that in this interview the plaintiff spoke of being on his brother's bond and declared his intention of paying the amount of it.   A few hours later the plaintiff called at the banking house and there met three of the directors, among whom was their legal adviser.   Without much preliminary conversation, after an offer of certain railroad bonds had been made and rejected, the plaintiff offered the four notes mentioned in the bill of complaint, one of which was for $5,000 and each of the others for a like sum with interest, in payment of the amount of the bond, and his offer was accepted.   The notes were accordingly drawn up, signed by the plaintiff and handed over to one of the directors, and the bond, which in the meantime had been lying on the table before the parties unopened and unread, was surrendered to the plaintiff.

12. The plaintiff was unattended by counsel and had previously consulted none, and his attention was not called to the terms of the bond, but he made no inquiry of the directors present.

or either of them with respect to his liability on the bond, or with respect to the affairs of the bank or the defalcation of the cashier, and no statement was made to him by them or either of them with respect to these matters; nor was there, so far as appears by the evidence, any intentional concealment by them or either of them from him of any fact relating to these matters, nor any willful misrepresentation, either at this time or before, of any matter affecting his liability.

13. The master finds that the four notes referred to in the bill of complaint were given, partly at least, in satisfaction of the bond, and that they were given in the belief shared at that time by all parties, that the same was a continuing bond and that the plaintiff was liable thereon for the defalcations of the cashier; but he further finds that in giving said notes the plaintiff was moved, not merely by his belief that he was liable on the bond, but also by a desire to relieve the cashier, who was his brother, to continue him in his employment and to save the family name from disgrace.

14. A few days after the notes were given by the plaintiff the amount represented by them was credited in the books of bank in the hands of the agent for liquidation upon the indebtedness of F. C. Fink to the bank, and a judgment bond in the sum of $10,000 was given by said F. C. Fink to cover the remainder of his indebtedness, and judgment thereon was entered in the court of common pleas of Dauphin county. But there is no evidence that said credit was given in pursuance of any agreement or understanding with the plaintiff or that he knew it had been given.

15. Two or three days after the notes were given or possibly the next day, F. C. Fink transferred to the plaintiff a policy of insurance on his life, a few shares of stock in the Farmers' Bank and a small amount of other property. F. C. Fink was at that time indebted to the plaintiff in the sum of $1,000, and the latter was also indorser for him on notes in the Farmers' Bank aggregating about $3,500, which were subsequently paid by the plaintiff. There is no evidence showing any direction by F. C. Fink that these securities should be applied to any particular account or that they were applied to any particular account by the plaintiff.

16. At the time the notes were given and for several days

thereafter it appears to have been the intention of the directors to make good the impairment of the capital stock and continue the business of the bank, to which course the superintendent of the banking department appears at first to have assented, but for some reason which has not been fully explained, the latter subsequently changed his mind and insisted upon the business of the bank being wound up, and the directors yielding to his demand closed the bank and placed its affairs in the hands of the defendant, Edward Bailey, as agent for liquidation.

17. At the time the bill was filed three of the notes above mentioned were unnegotiated and in the hands or under the control of the defendants. The note for $5,000 falling due first was paid at maturity by the plaintiff.

It may not be out of place for the master to state briefly his reasons for the 13th finding of facts, as it contains matters of considerable materiality in the case.

It is true that the answer of the defendants is responsive to the bill and denies that the notes were given in satisfaction of the bond, or that they were given in mistake as to the liability of the plaintiff thereon; and it is also true that the plaintiff himself is the only witness who testifies directly in support of the allegations of his bill on this point. But in the opinion of the master there are corroborating circumstances equivalent to the testimony of a second witness. The bond was constantly brought forward. It was laid by the cashier before the superintendent of banking and the directors with a statement that the plaintiff would pay the amount of it. In the evening of the same day the cashier reminded the plaintiff that the latter was surety upon it. Early the next morning when the director, who was also the legal adviser of the directors, visited the plaintiff at his place of business, the fact that the latter was on the bond was mentioned by both, and the plaintiff declared his intention "to pay it." A few hours later, when the plaintiff met the directors at the banking house, the bond was produced and laid upon the table before the parties while the negotiations proceeded, and upon the execution and delivery by him of notes for the exact amount of the bond with interest to the maturity of the notes—except upon the first note maturing in about thirty days—the bond was given over to and taken away by him. The plaintiff testifies that he at the time considered himself lia-

ble upon the bond, and the gentleman who was both director and counsel for the directors, and was present at the meeting of the parties in the banking house, was at that time of the same opinion. Upon all the evidence it is impossible to escape the conclusion that there existed in the minds of all the parties a belief that the plaintiff was liable upon the bond, and that the notes were given, in part at least, in satisfaction of his supposed liability.

The second branch of the thirteenth finding of facts rests partly upon the admissions of the plaintiff himself and partly upon the evidence to the same effect introduced by the defendants. While insisting that at the time the notes were given he supposed himself to be liable upon the bond, he stated in his testimony that he was moved by other motives also. They were, first, his supposed liability upon the bond; second, his desire to relieve his brother, and, third (which was probably incidental to the second) his expectation that the bank would continue to do business. Upon the third he himself appears to lay the most stress, although he does not allege that any promise or inducement was held out to him by the directors that the business of the bank would be continued or that he asked for any such assurance, but he alleges that he was misled by the published reports of the bank, which showed its affairs to be in good condition, whereas in fact they were not so. Upon the other side several of the directors testified that before and at the time the notes were given the plaintiff declared that even if he was not legally bound he was morally bound, and intended to pay the bond. This the plaintiff denied. It was further testified that the plaintiff, at the time he gave the notes, declared that he gave them to relieve his brother, and that he was desirous of having preserved "the good name of Fink;" and still further that just before the notes were given he requested the directors not to prosecute his brother and asked for a promise to that effect in writing, and that such promise was refused upon the ground that it would be unlawful and would afford no protection, whereupon his request was withdrawn. The attention of the plaintiff was not called to those matters, although he subsequently appeared upon the witness stand. Without attempting any specific finding as to the precise language used by the plaintiff, it sufficiently appears that he was largely influenced to give

the notes by his desire to aid his brother, and that he substantially so stated to the directors at the time.

Paragraphs 10 and 11 of the original bill are as follows:

[10. That plaintiff believes a settlement or payment of a large part of said defalcation was made some years ago with Daniel Eppley, then president of the bank, or some other officer, that he is not informed of the date or nature of such payment or settlement, and had no knowledge thereof until after he had given the notes.

11. That plaintiff believes a large part of said defalcation was the result of certain joint speculations of F. C. Fink and others connected with the administration of the affairs of the bank, the particulars of which he is not informed of.]

\*    \*    \*    \*    \*    \*    \*    \*

Upon the facts found and for the reasons given in the foregoing discussion the master concludes as matter of law as follows:

1. The plaintiff was not discharged from liability as surety upon the bond mentioned in paragraph 4 of plaintiff's original bill by reason of any negligence on the part of the officers or directors of the defendant bank.

2. Said bond was an annual bond upon which the plaintiff was responsible for the good conduct and fidelity of F. C. Fink as cashier of said bank, only during the term to which said F. C. Fink had been elected at the time said bond was given, to wit: during the year ending May, 1874.

3. The plaintiff was not, at the time the notes, mentioned in paragraph 5 of his original bill, were given, liable upon said bond for any part of the defalcation or defalcations of said F. C. Fink in the pleadings mentioned.

4. Said notes are and each of them is without any consideration in law or equity to support them or it.

5. Said notes having been given without consideration and in the mutual mistake of all parties that the plaintiff was, as surety upon said bond, liable for the defalcations of said F. C. Fink in the pleadings mentioned, and said notes being negotiable, and, at the time of the filing of the bill in this case, not yet due, the plaintiff is entitled to equitable relief against the payment of said notes.

6. Upon the facts found by the master the plaintiff is entitled

to a decree for the delivery up to him and cancelation of the second, third, and fourth notes mentioned in paragraph 5 of plaintiff's original bill.

7. Under all the circumstances of the case the costs of these proceedings should be paid by the Farmers' Bank, defendant.

The court in an opinion by SIMONTON, P. J., affirmed the sixth conclusion of law as found by the master, and entered the following decree:

And now, February 19, 1896, this cause came on to be heard on exceptions to the master's report and was argued by counsel, whereupon, upon due consideration thereof, it is ordered, adjudged and decreed as follows, to wit:

1. That the exceptions to the master's report be and the same are hereby overruled.

2. That the said Edward Bailey, liquidating agent of the Farmers' Bank of Harrisburg, or such others of the defendants as may be in possession or control of the same, be and they are hereby required and directed to deliver up to the plaintiff for cancellation the second, third and fourth promissory notes mentioned and described in paragraph 5 of plaintiff's original bill, to wit: One note dated February 18, 1893, for five thousand (5,000) dollars, due July 4, 1893, with interest from date, amounting at maturity to five thousand one hundred and ten (5,110) dollars; one other note dated February 18, 1893, for five thousand (5,000) dollars, due October 5, 1893, with interest from date, amounting at maturity to five thousand one hundred and eighty-eight dollars and eighty-three cents ($5,188.83), and one other note dated February 18, 1893, for five thousand (5,000) dollars, due January 4, 1894, with interest from date, amounting at maturity to five thousand two hundred and sixty-three dollars and thirty-three cents ($5,263.33), upon surrender to the defendants of the bond described in plaintiff's original bill.

3. That the Farmers' Bank of Harrisburg pay the costs of these proceedings.

*Error assigned* among others was above decree, quoting it.

*Lyman D. Gilbert*, of *Weiss & Gilbert*, with him *Thos. S. Hargest* and *C. H. Bergner*, for appellant.—There was a settlement

of compromise of a doubtful liability: Hagey v. Detweiler, 35 Pa. 412. If a compromise of a doubtful right is fairly made between parties, its validity cannot depend upon any future adjudication of that right: Stevens v. Lynch, 12 East, 38; Bidwell v. Catton, Hobart, 216; Brown v. Pring, 1 Ves. Sr. 407; Gibbons v. Caunt, 4 Ves. Sr. 849; Gordon v. Gordon, 3 Swanst. 470; Pickering v. Pickering, 2 Bevan, 31, 56; Goymour v. Pigge, 8 Jurist, p. 526; Leonard v. Leonard, 2 Ball & Beatty, 179, 180; Shotwell v. Murray, 1 Johns. Ch. 516; Lyon v. Richmond, 2 Johns. Ch. 61; Dunnage v. White, 1 Swanst. 151, 152; Harvey v. Cooke, 4 Russell, 34; Stewart v. Stewart, 6 Clark & Finnelly, 969; Longridge v. Dorville, 7 Eng. C. L. R. 43; Lucy's Case, 4 De G., M. & G. 355; Callisher v. Bischoffsheim, L. R. 5 Q. B. 450; Balfour v. The Sea Fire Life Assurance Co., 91 E. C. L. R. 300; Oxford v. Barelli, 20 W. R. 116; Miles v. New Zealand Alford Est. Co., 32 L. R. Ch. Div. 283; Sibree v. Tripp, 15 M. & W. 29; Sowerby v. Butcher, 2 Cr. & M. 367; Baker v. Walker, 14 M. & W. 467; Poplewell v. Wilson, 1 Strange, 264; Babcock v. Hawkins, 23 Vt. 561; Russell v. Cook, 3 Hill, 504; Barlow v. The Ocean Insurance Co., 4 Metc. 270; Tuttle v. Tuttle, 12 Metc. 551; Hubbard v. Coolidge, 1 Metc. 84, 92, 93; Burr v. Wilcox, 13 Allen, 273; Taylor v. Patrick, 1 Bibb. 168; Stoddard v. Mix., 14 Ct. 12; Clark v. Sigourney, 17 Ct. 511; Titus v. Ash, 24 N. H. 319; Perkins v. Bumford, 3 N. H. 522; Day v. Gardner, 5 Cent. Rep. 630; Grandin v. Grandin, 8 Cent. Rep. 587; Rue v. Meirs, 10 Cent. Rep. 682; Devecmon v. Shaw, 12 Cent. Rep. 886; Given v. Corse, 2 W. R. 579; Valle v. Picton, 8 W. R. 734; Bank v. Geary, 5 Peters (U. S.), 99, 114; The Richardson & Boynton Company v. The Independent District of Hampton, 70 Ia. 573; Adams v. Morton, 37 Ia. 255; Goodrich et al. v. Stanley, 24 Ct. 613; Naylor v. Winch, 1 Sim. & Stuart, 555; 1 Story's Eq. sec. 131; 2 Pomeroy's Eq. Jur. sec. 855; Hunt v. Brown, 5 New England Rep. 810; Story on Contracts, sec. 440; Perkins v. Gay, 3 S. & R. 325; Barton v. Wells, 5 Whart. 225; O'Keson v. Barclay, 2 P. & W. 531; Brown v. Sloan, 6 Watts, 421; Logan v. Mathews, 6 Pa. 417; Chamberlain v. McClurg, 8 W. & S. 31; Muirhead v. Kirkpatrick, 21 Pa. 237; Blockley v. Blockley, 122 Pa. 1.

There was forbearance to sue and an agreement to forbear:

Clark v. Russel, 3 Watts, 217; Lyth v. Ault & Wood, 7 W. H. & G. 669; Hamaker v. Eberley, 2 Binn. 505; Johnes v. Potter, 5 S. & R. 519; Silvis v. Ely, 3 W. & S. 420; Saalfield v. Manrow, 165 Pa. 114. There was payment of the brother's indebtedness: Popple v. Day, 123 Mass. 520; Sykes v. Chadwick, 18 Wall. 141; Baker v. Walker, 14 M. & W. 467; Armstrong v. Southern Express Co., 4 Baxter, 376; Conmey v. Macfarlane, 97 Pa. 361; Forster v. Fuller, 6 Mass. 58; Delano v. Bartlett, 6 Cush. 364; Cumber v. Wane, 1 Sm. Leading Cas., 595; Corbet v. Cochran, 2 Hill (S. C.), 41; Hind v. Holdship, 2 Watts, 104; Osgood v. Franklin, 2 Johns, Ch. Rep. 23; Esling v. Zantzinger, 13 Pa. 50. There was a surrender of the bond: Shortrede v. Cheek, 1 Adolph. & Ellis, 37; Smith v. Smith, 13 C. B. N. S. 429; Lawrence v. McCalmont, 2 How. 426; Goodman v. Simonds, 61 U. S. 343; Droper v. Hitt, 43 Vt. 439; Churchill v. Bradley, 58 Vt. 403; Newhall v. Paige et al., 10 Gray, 366; Bank v. Coit, 7 Cent. Rep. 39; Coggins v. Murphy, 121 Mass. 166; Wilton v. Eaton, 127 Mass. 174. There was a change in the position of the parties: Cook v. Wright, 1 B. & S. 559. Continuation of the business of the bank was possible: Sickles v. Herald, 149 N. Y. 332; St. Mark's Church v. Teed, 120 N. Y. 583.

The bond was continuing: Lord Arlington v. Merricke, 2 Saunders, part II. p. 411; Liverpool Water Works Co. v. Atkinson, 6 East, 507; St. Saviour's Wardens v. Bostock, 5 Bos. & P. 175; Hassell v. Long, 2 M. & S. 363; Peppin v. Cooper, 2 B. & A. 431; Leadley v. Evans, 2 Binn. 32; Kitson v. Julian, 4 E. & B. 854; Mayor of Cambridge v. Dennis, 96 E. Com. Law Rep. 660; Com. v. Fairfax, 4 Hen. & Mun. (Va.) 208; Amherst Bank v. Root, 2 Metc. 522; Chelmsford Co. v. Demarest, 7 Gray, 1; Treasurer v. Mann, 34 Vt. 371; State v. Wayman, 2 Gill & J. (Md.) 254; Exeter Bank v. Rogers, 7 N. H. 21; Mut. Loan & Building Assn. v. Price, 16 Fla. 204; Boston Mfg. Co. v. Messinger, 2 Pick. 223; Richardson School Fund v. Dean, 130 Mass. 242; South Carolina Society v. Johnson, 1 McCord, 41; Moss v. State, 10 Mo. 338; Mayor v. Crowell, 40 N. J. Law, 207; Thompson v. State, 37 Miss. 518; People v. Beach, 77 Ill. 52; Com. v. Drewry, 15 Grattan, 1; State ex rel. Jackson Twp. v. Berg, 50 Ind. 496; State v. Kurtzebom, 78 Mo. 98; Long v. Seay, 72 Mo. 648; B. & L. Assn. v. McMullen,

1 Penny. 431; Shackamaxon Bank v. Yard, 143 Pa. 129; Bank v. Barrington, 2 P. & W. 27; Oswald v. Mayor of Berwick, 5 H. of L. Cases, 856; Dedham Bank v. Chickering, 3 Pick. 335; Savings Loan Co. v. O. F. Hall Assn., 48 Pa. 446; Elam v. Bank, 13 Va. L. J. 384., s. c., 9 S. E. Rep. 498 (Va. Ct. of App. 1889); Humboldt S. & L. Assn. v. Wennerhold, 20 Pac. Rep. 553 (Cal. 1889).

There was no material mistake: Meredith v. Haines, 14 W. N. C. 364; Kelly v. Solari, 9 M. & W. 54; 2 Pomeroy's Eq. 843.

If there was a mistake of law, there could be no relief: Heacock v. Fly, 14 Pa. 540; Gross v. Leber, 47 Pa. 520; Russell's App., 75 Pa. 269; Wilson v. Ott, 173 Pa. 253; Lansdown v. Landsdown, Mosely, 364; s. c., 1 Jac. & W. 502; Bank of U. S. v. Daniel, 12 Peters, 32; Upton v. Tribilcock, 91 U. S. 45; Fish v. Cleland, 33 Ill. 243; Starr v. Bennett, 5 Hill, 303; Lewis v. Jones, 4 B. & C. 506; Rashdall v. Ford, L. R. 2 Eq. 750; Bank v. Daniel, 12 Pet. 32; Hunt v. Rousmanier, 1 Pet. 1; s. c., 8 Wheat. 174; Mellish v. Robertson, 25 Vt. 603; Leavitt v. Palmer, 3 N. Y. 19; Bingham v. Bingham, 1 Ves. Sr. 126; Cooper v. Phibbs, L. R. 2 H. L. 149; Good v. Herr, 7 W. & S. 253; Hunt v. Moore, 2 Pa. 109; George's App., 12 Pa. 260; McAninch v. Laughlin, 13 Pa. 370; Rankin v. Mortimer, 7 Watts, 372; Clapp v. Hoffman, 159 Pa. 531.

*Robert Snodgrass,* for appellee, cited as to the nature of the bond: Mut. Building & Loan Assn. of McKeesport v. McMullen, 1 Penny. 431; Shackamaxon Bank v. Yard, 143 Pa. 129. As to the status of the notes substituted for the bond: Com. v. West, 1 R. 299; Loan Co. v. O. F. Hall Assn., 48 Pa. 449; McNutt v. Loney, 153 Pa. 281; Nace v. Boyer, 30 Pa. 110; Conmey v. Macfarlane, 97 Pa. 361. As to the question of mistake: 2 Pomeroy Eq. Jur. sec. 849, p. 1178.

OPINION BY MR. JUSTICE MITCHELL, October 5, 1896:

The plaintiff by his bill seeks to rescind a contract and repossess the evidence of his liability. It is admitted that there was no accident, and no concealment, imposition or other element of fraud. But the learned master found there was such a mistake by the plaintiff as to his liability on the bond as to

bring his case within that class of mixed mistake of law and fact against the consequence of which courts of equity sometimes relieve. After a very clear and able review of the decisions in England and some other states, the learned master says frankly that he "feels some embarrassment in applying this doctrine to the case in hand in view of some of the decided cases in this state," but nevertheless concludes that he may do so. The Pennsylvania cases have not yet followed the refinements by which the ancient rule that ignorance of the law excuses no man has been restricted if not frittered away by exceptions, and equity has so far contented itself with relief in cases of mutual mistake of legal rights where it was possible to restore both parties to statu quo. If that cannot be fully done, equity will not assist one party to unload the burdens on the other. An illustration may be drawn from the present case. If the bank had first come to the opinion now advanced by the complainant, that not being liable on the bond he could not be held on the notes, and had at once passed the notes away for value and then filed this bill to rescind, the case would have met a summary dismissal for inability to restore the status quo. It is said that complainant tenders a return of the bond, but this would not restore the parties to their former situation, as in the meantime, in reliance on the validity of these notes, some of the defendants have incurred personal liabilities in aid of the bank. The evidence on this point was excluded for irrelevancy by the master, but this was error, and we are entitled to take the averment as true in view of the burden of proof on complainant to show that the status could be restored.

It is not necessary to follow the master in his detailed examination of our cases on mistake of law, as the court below was of opinion that that question did not arise and rested the decision exclusively on two grounds, first that the bond was not continuing, and there was no liability upon it, and secondly, that there was no other consideration for the notes.

First, as to the bond. The condition is that whereas F. C. Fink has been appointed cashier, etc., if he shall well, truly and faithfully perform all the duties, etc. "so long as he shall continue in that capacity" then the obligation to be void, etc. The master learnedly and ably traced the rule as to the liability of sureties on official bonds from its origin in Lord Arlington v.

Merricke, 2 Saunders, 411, and other cases, in which the term of office was recited in the bond itself, down through its gradual enlargement until it has come in some states to a strong and almost conclusive presumption, which is most fully stated by Poland, C. J., in Treasurer of Vt. v. Mann, 34 Vt. 371, as follows : " It seems now to be perfectly settled by authority in reference to bonds or obligations given to secure the performance of official duties, that where the appointment is for a limited period, which is recited in the condition, or where it is not recited in the condition, but is fixed and determined by law, the obligation only extends for the period named in the condition or the term fixed by law, and will not extend to cover any extension of the time by a future appointment or subsequent election, although the language of the condition as to time be general and unlimited. The presumption in such cases is held to be that the language is used in reference to the existing office or appointment which the principal holds, and that the sureties do not intend to bind themselves for any indefinite and unlimited extent of time, depending upon the contingency of future elections."

It is conceded that this rule, even thus carefully stated, has never been expressly adopted in any Pennsylvania case. As a surety's contract is usually for the benefit of others rather than directly for his own, it has always been held that he is entitled to have the conditions of his liability strictly fulfilled before it is enforced, and in the liberal application of this principle cases are probably not few in which courts have carried adherence to the letter in favor of sureties beyond any substantial equity. An illustration will be found in Shackamaxon Bank v. Yard, 143 Pa. 129, which will be referred to further on, and there is an instructive passage worth quoting, in the argument for appellant in that case, by one of the most learned lawyers that ever adorned the bar of this court, the late Richard C. McMurtrie, " there is no distinction between a surety and a principal so far as the construction or meaning or effect of a document is concerned. There is a broad distinction between the liability of the principal and of the surety. But not under the written contract. That may be varied by the principal but it is not the contract that is varied; it is another contract that arises by implication which varies the liability. Naturally the plea of

non in hæc foedera veni is never used by the principal, because he is sued not on the express contract but on that growing out of his conduct. I think it is sometimes overlooked that the apparent strain not to hold a surety is nothing but a strict exaction of the very contract, and this only because there is no other ground of liability."

The contract of suretyship though only enforced according to its strict terms is nevertheless nothing more than a contract. No particular form of words is necessary to be observed, and in construing it there is no reason why courts should not be governed by the rule applicable to all other contracts that the actual intention of the parties must prevail. As to official bonds the presumption that they apply only to the existing term of the officer may be admitted, but the presumption is very far from conclusive, and if it is clear that the parties meant to create a continuing liability, the bond must be held to have done so. This was very explicitly and forcibly laid down as the rule in the well considered and leading case of Shackamaxon Bank v. Yard, 143 Pa. 129. The condition of the bond was for the faithful performance of the duties of cashier " during the time of his employment by the said bank, whether under his present election or under any subsequent election to the said position." The cashier held over, but without re-election, and the default occurred after the expiration of his first term. The court below, adhering to the strict letter of the bond, held the surety discharged by the absence of a formal re-election, but this court reversed the judgment, and put the decision explicitly on the intention of the parties. " The purpose," said our brother WILLIAMS, " to make the bond impose a continuing liability and relieve against the necessity for annual renewals was a lawful one, and the words employed for that purpose are apt and sufficient."

If the present case was of first impression we should have no hesitation in holding that the bond was continuing. The complainant himself in paragraph 3 of his amended bill, so states the belief and intention of the parties at the time of execution. How far deference to a line of cases in which the language was similar, but in none of them identical, might lead to a different conclusion, it is not now necessary to decide, as we are of opinion that there was ample other consideration for the notes.

Secondly, as to consideration.   Whatever the extent of the lia-
bility on the bond might finally have been determined to be if
the contest had been fought out on it, there can be no question
that it was an obligation to which complainant was a party, on
which he could have been sued, and upon which the result of
suit would have been open to doubt.   Its surrender therefore
was the settlement of a claim made on it, not then disputed,
and not now open to dispute on the ground that it could not
have been successfully maintained.   The sufficiency of the con-
sideration for a compromise is not to be determined by the
soundness of the original claim of either party.   The very ob-
ject of compromise is to avoid the risk or trouble of that ques-
tion.   The settlement in the present case had all the substantial
elements of a compromise with only the unusual but immaterial
feature that the claim was made and received not in a hostile
but in an amicable spirit.   The bank claimed $20,000 in cash
on a bond on which it had an immediate right of suit; the com-
plainant first promised Mr. Bergner part cash and the rest in
notes, and at the meeting with the directors offered part in
Allegheny Valley Railroad bonds and the rest in notes; the
bank refused to take the railroad bonds, but after some negoti-
ation agreed to accept four notes payable at various dates up
to January, 1894, the effect of which would be to postpone the
bank's present right of suit until the maturity of the notes re-
spectively; the notes were made and delivered by complainant
and in return for them, as he says himself, he received back
his bond.   In the entire absence of fraud, accident or mistake
of any of the facts, there is no equity on which a court ought
to disturb such a settlement.   The cases on this subject have
been diligently collected and very clearly arranged in the excel-
lent argument of the counsel for appellant, but it is sufficient
here to refer generally to the American notes to Stapilton v.
Stapilton, 2 Lead. Cases in Equity, 1703.

Other items of consideration were urged by appellant.
1. Agreement for forbearance, already discussed incidentally
in the preceding paragraph.   2. That the notes were given and
received as part payment of the brother's debt, and were accord-
ingly credited on his account in the bank's books.   The master
finds this a voluntary act, there being no evidence of any ex-
press agreement that it should be done, but we cannot doubt

that it was a clearly implied part of the arrangement, and would have been so held if the bank had at once sued F. C. Fink for his whole debt. 3. That in reliance on this settlement there was a change in the position of the parties, so as to make a restoration of the status quo impossible. This also has been incidentally discussed already. 4. The credit to the bank, and the permission from the superintendent of banking to continue business. On this I will merely cite Sickles v. Herold, per PRYOR, J., 15 Misc. Rep. N. Y. 583, affirmed in general term, 15 Misc. Rep. 116, and affirmed with modification on minor point, 149 N. Y. 332.

All or any of these matters would afford sufficient consideration for the notes, but it is not necessary to discuss them further.

Decree reversed and bill dismissed with costs.